UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

STEPHEN PENNYMAN,                    :
    *Plaintiff*,                              :
                                    :
    v.                                              :      No. 3:19-CV-1229 (VLB)
                                       :
DANIEL PAPOOSHA, et al.              :
    *Defendants.*                             :      September 24, 2019

INITIAL REVIEW ORDER

On August 7, 2019, Stephen Pennyman ("Plaintiff"), an inmate currently confined at the MacDougall-Walker Correctional Institution ("MWCI") in Suffield, Connecticut, filed a complaint *pro se* and *in forma pauperis* pursuant to 42 U.S.C. § 1983, against twenty-two Department of Correction ("DOC") officials.  Compl. (Dkt. No. 1) at 1-7, 13-14.  The defendants are Security Risk Group ("SRG") Coordinator Daniel Papoosha, SRG Coordinator John Aldi, Security Director A. Santiago, Warden Kenneth Buttricks, Deputy Warden Nathaniel Hein, Commissioner Scott Semple, Captain F. Martinez, District Administrator Murphy, Counselor Ferreira, Counselor Supervisor Crandall, Counselor Supervisor Vasquez, Population Management Director Maiga, Population Management Director Stompa, Warden Nick Rodriguez, Lieutenant Lizon, Captain Rivera, Warden William Mulligan, Counselor Feoirre, Captain Kelly, Counselor Supervisor Duran, Warden Stephen Faucher, and District Administrator Angel Quiros.  *Id.* at 3-7.  On September 9, 2019, Plaintiff moved to amend his complaint with additional allegations.  Mot. to Amend Compl. (Dkt. No. 9).  The Court will

GRANT the motion to amend and review the allegations stated therein pursuant to 28 U.S.C. § 1915A.  For the following reasons, Plaintiff's amended complaint is dismissed in part.

I.  Standard of Review

Pursuant to 28 U.S.C. § 1915A, this Court must review prisoner civil complaints and dismiss any portion of the complaint that is frivolous or malicious, that fails to state a claim upon which relief may be granted, or that seeks monetary relief from a defendant who is immune from such relief.  Although detailed allegations are not required, the complaint must include sufficient facts to afford the defendants fair notice of the claims and the grounds upon which they are based and to demonstrate a right to relief.  *Bell Atlantic v. Twombly*, 550 U.S. 544, 555-56 (2007).  Conclusory allegations are not sufficient.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atlantic*, 550 U.S. at 570.  Nevertheless, it is well-established that "[*p*]*ro se* complaints 'must be construed liberally and interpreted to raise the strongest arguments that they suggest.'"  *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006)).

II.  Factual Allegations

In October 2015, Plaintiff was approved for protective custody placement in the SRG unit because of issues arising from information he had provided to the Meriden police about the Bloods gang.  *See* Am.

Compl. (Dkt. No. 9-1) ¶¶ 28-30, 34-35.  Specifically, Plaintiff provided the police with information on two "gang hits," including the name "Fifty," who was a high-ranking Bloods member, and the police in turn provided that information to the news media.  *Id.* at ¶ 35.  Another high-ranking member of the Bloods named Teejay Johnson (a/k/a "Flex") knew about the information Plaintiff had provided and labeled Plaintiff as a "snitch and plate."  *Id.* at ¶ 29.  Plaintiff had also been threatened and assaulted by another inmate named Andrews.  *Id.* at ¶ 34.

Plaintiff was released from DOC custody in 2016 but returned in 2017 and was reinstated in SRG protective custody.  Am. Compl. ¶ 30.  He did not, however, receive the required ninety-day review of his SRG classification and remained in protective custody because it was not safe for him in general population.  *Id.*

On September 23, 2017, Plaintiff wrote an Inmate Request to SRG Coordinator Aldi about a conversation they previously had about removing Plaintiff from the SRG unit and placing him in general population.  Am. Compl. ¶ 28.  He stated that he can longer be classified as a member of the Bloods gang because he had provided information to the police about other gang members and, therefore, requested that he be removed from the SRG unit.  *Id.*  Aldi did not respond to Plaintiff's letter.  Pl.'s Ex. A-1 (Dkt. No. 9-2) at 2.

Plaintiff also informed Counselor Ferreira about the situation.  Am. Compl. ¶¶ 33-34.  Ferreira told him that he had "made people mad about [his] grievances" and about the incident with Andrews.  *Id.* at ¶ 34.

On October 2, 2017, Plaintiff wrote another request to Aldi explaining that he cannot be released from protective custody and go back to the standard SRG unit because he had been labeled as a "snitch and plate" in the Bloods gang.  Am. Compl. ¶ 35.  He also wrote letters to defendants Semple, Buttricks, Papoosha, Martinez, Hein, and Buttricks requesting that he remain in protective custody and not be returned to the SRG unit because of his involvement in the police investigation and the threats made by Flex and other Blood-affiliated inmates.  *Id.* at ¶¶ 36-40.

On October 6, 2017, Plaintiff was given a disciplinary report ("DR") for interfering with safety after an apple was discovered in his toilet clogging the drain.  Am. Compl. ¶ 41.  He received seven days of punitive segregation until October 13.  *Id.*

On October 10, 2017, Plaintiff wrote to Director Santiago about how Aldi, Papoosha, and Buttricks were ignoring his pleas not to be returned to the SRG unit.  Am. Compl. ¶ 43.  He explained to Santiago the situation regarding his cooperation with the Meriden police and the Bloods gang.  *Id.* He also expressed his concerns to the mental health unit and wrote another letter to Papoosha, Buttricks, Semple, and the population management unit explaining that he will be extorted and assaulted by other Bloods members if he returns to SRG.  *Id.* at ¶¶ 44-48.

Plaintiff wrote another letter to Papoosha on October 12 telling him that he was a "world wide plate" in the Bloods gang.  Am. Compl. ¶ 50.  The next day, Papoosha placed him on transfer detention status without a written justification.  *Id.* at ¶ 51.  Plaintiff responded with a letter to Papoosha and Buttricks complaining that he should not be placed on transfer detention status without first having a protective custody hearing or receiving his personal property.  *Id.* at ¶ 53.

On October 14, 2017, Plaintiff received another DR for interfering with safety and security after refusing to permit a correction officer to handcuff him for a cell search.  Am. Compl. ¶ 54.  That same day, Plaintiff wrote to Deputy Warden Hein requesting camera footage after an inmate flooded the tier and instructed another inmate "to push the water to the back of the wing" and said, "fuck Pennyman."  *Id.* at ¶ 55.  He also wrote another letter to Papoosha telling him that his placement on transfer detention status violated DOC Administrative Directives and was retaliation for a prior civil suit.  *Id.* at ¶ 56.

Plaintiff wrote Papoosha two more letters on October 16 and 18 explaining that he was not on the transfer list, that he had been labeled as a "plate snitch" by the Bloods, that a "green light" for a hit on him had been issued, and that protective custody was only way to remove him from SRG classification.  Am. Compl. ¶¶ 58-59.  He sent more letters to Buttricks and the population management unit explaining that, if he remained in the standard SRG unit, he would be "jumped."  *Id.* at ¶¶ 60-61.

On October 21, 2017, Plaintiff received a restrictive housing unit ("RHU") order.  Am. Compl. ¶ 63.  The stated reason for the order was that Plaintiff "pose[d] a serious threat to life, property, self, other inmates, and/or the security of the facility."  *Id.*  The next day, he received a copy of an inmate request written by another inmate named Rivera.  *Id.* at ¶ 65.  Rivera stated that he had no issues with Plaintiff and that he would like him back in the SRG unit.  *Id.*  Rivera previously had spit on Plaintiff and stole his personal property.  *Id.* at ¶ 66.

On October 23, Plaintiff wrote to District Administrator Murphy explaining that it was not safe to remove him from protective custody and place him back in the SRG unit because of his cooperation with the Meriden police and threats made by the Bloods gang.  Am. Compl. ¶ 68.  That same day, he received a second RHU order stating that he had been placed on transfer detention status pending removal from the SRG program at Northern Correctional Institution ("Northern").  *Id.* at ¶ 69.

On October 26, 2017, Plaintiff had a hearing with Crandall, Vasquez, and Ferreira for the involuntary removal of his protective custody status.  Am. Compl. ¶ 70.  Plaintiff told those defendants that it was not safe for him to return to the SRG unit because he had been labeled as a snitch and a "world-wide plate" for the Bloods.  *Id.*  He gave Crandall and Vasquez copies of the written requests he had sent to Papoosha, Aldi, Butricks, Semple, Martinez, and Hein.  *Id.*  Crandall and Vasquez told Plaintiff that the

decision to send him back to the SRG unit had already been made.  *Id.* at ¶
71.  Afterward, Plaintiff remained on transfer detention status.  *Id.* at ¶ 72.

On November 6, 2017, Plaintiff was transferred to Northern and
placed in Phase I of the SRG program.  Am. Compl. ¶ 74.  He was assigned
to a cell with Flex, who had been in the SRG unit in 2015 when Plaintiff was
labeled as a snitch.  *Id.* at ¶ 75.  However, Flex subsequently "kick[ed]"
Plaintiff out of his cell, telling him that he could not live with any Blood
members, and Plaintiff moved into the adjacent cell.  *Id.* at ¶¶ 75-76.  Flex
also told Plaintiff that he had to pay rent to Blood members, and if he did
not do so, he would be assaulted.  *Id.* at ¶ 75.  He instructed Plaintiff to pay
three dollars per week for commissary along with trays of food.  *Id.* at ¶ 76.

On November 13, 2017, Plaintiff wrote letters to Lieutenant Lizon,
Warden Rodriguez, and the population management unit explaining that he
was being extorted for money and food by the Bloods gang because he
had been labeled as a snitch for his cooperation with the Meriden police
and that he needed to go back to protective custody.  Am. Compl. ¶¶ 77-79.
When they did not respond, Plaintiff sent follow-up letters to Lizon,
Rodriguez, and Murphy, stating that he was running out of money and was
not getting enough food because of the extortion from the Bloods gang.  *Id.*
at ¶¶ 80-82.  He explained that he would be assaulted if he did not comply
with their demands.  *Id.* at ¶ 81.  Plaintiff continued to write letters to
defendants Semple, Aldi, and Quiros in January and February of 2018,
expressing his concerns for his safety based on the extortion from the

Bloods gang and the threats of assault he was receiving in the SRG unit. *Id.* at ¶¶ 84-91.

On March 26, 2018, Plaintiff was transferred to Phase II of the SRG program at MWCI.  Am. Compl. ¶ 93.  He continued to send letters to defendants Mulligan, Feoirre, Rivera, Murphy, Aldi, and Santiago in April and May of 2018 regarding the threats and the extortion from the Bloods gang.  *Id.* at ¶¶ 94-101.

On June 4, 2018, Plaintiff was transferred to Phase III of the SRG program at the Corrigan-Radgowski Correctional Center ("Corrigan").  Am. Compl. ¶ 108.  Thereafter, he wrote letters to defendants Duran, Kelly, Faucher, Murphy, Santiago, and Aldi stating that he was still being extorted for money and food from the Bloods gang and requesting a return to protective custody.  *Id.* at ¶¶ 109-23.

On November 21, 2018, two Blood members assaulted Plaintiff in the E-Pod unit at Corrigan.  Am. Compl. ¶ 125.  He suffered an abrasion to the right side of his neck and a laceration to his forehead.  *Id.* at ¶ 126.  He later received a DR for fighting and was sent to segregation for seven days.  *Id.* at ¶¶ 125, 129.  While in segregation, he wrote letters to Kelly and Faucher about the assault, how he had been previously threatened by Bloods members, and that he was not safe in the SRG unit.  *Id.* at ¶¶ 127-28.

After he was released from segregation, Plaintiff refused to leave the Admitting and Processing room and return to his housing unit out of concern for his safety.  *See* Am. Compl. ¶¶ 131-32.  As a result, he received

a DR for interfering with safety and security.  *Id.* at ¶ 132.  The DR resulted

in five days of punitive segregation and thirty days loss of mail and

visitation privileges.  *Id.* at ¶ 133.

On November 30, 2018 and December 9, 2019, Plaintiff wrote letters

to Murphy and Semple about the assault by the Bloods members.  Am.

Compl. ¶¶ 135-36.  He also filed an administrative grievance about the

assault, complaining that the defendants ignored the risk of harm which he

had previously made known in his letters.  *Id.* at ¶ 137.  Aldi responded two

days later in a letter, stating that Plaintiff's own actions "ha[ve] caused

[his] continued placement on [SRG] member status" and that, if he had any

legitimate concerns for his safety, he needed "to bring them to the

attention of facility staff immediately and not wait for [Aldi] to respond to a

request."  Pl.'s Ex. K-2 (Dkt. No. 9-4 at 3).  Plaintiff's grievance was returned

without disposition on January 14, 2019 because Plaintiff did not attach an

Inmate Request, separately grieve each matter stated therein, or state his

complaint simply and coherently.  Pl.'s Ex. K-4 (Dkt. No. 9-4 at 5).

Sometime in January 2019, Plaintiff had a conversation with Aldi and

Papoosha about his situation.  *See* Am. Compl. ¶ 146.  On January 28, 2019,

another inmate told Plaintiff that he had overheard that conversation, called

him a snitch, and told him that there was "no room for rats, Nigga.  Check

your name.  You in the paper."  *Id.* at ¶ 147.  The inmate assaulted Plaintiff,

and afterward, Plaintiff received another DR for fighting.  *Id.*  Plaintiff later

discovered that the inmate received permission to assault him because

Plaintiff was not paying rent.  *Id.* at ¶ 148.  During the DR hearing, the investigator concluded that Plaintiff was not the initial aggressor and, thus, sanctioned him to only four days of punitive segregation.  *Id.* at ¶ 149.

In the following months, Plaintiff sent letters to defendants Feoirre, Murphy, Aldi, Santiago, and Papoosha about the risk of harm he faced in the SRG unit and how he had already been assaulted twice by Bloods members.  Am. Compl. ¶¶ 152-66.  On March 6, 2019, in response to one of those letters, Papoosha sent Plaintiff a letter reiterating the same comments made by Aldi (i.e. that Plaintiff's own actions caused the continuation of his SRG placement and that he needed to alert facility staff immediately regarding his safety concerns rather than sending letters).  *Id.* at ¶ 171; Pl.'s Ex. N-8 (Dkt. No. 9-4 at 38).  Plaintiff replied on March 10, stating that he had not been an active gang member for five years and that the DRs he received resulted from assaults by other Bloods members because he had previously been labeled as a snitch.  *Id.* at ¶ 172; Pl.'s Ex. N-9 (Dkt. No. 9-4 at 39).

On March 29, 2019, Plaintiff wrote a letter to Papoosha and Santiago about his ninety-day review of his SRG placement and explaining that he cannot be classified as a gang member given his previous cooperation with the police against the Bloods.  Am. Compl. ¶¶ 181-82.  He received a written response from Santiago on April 17, 2019, concluding that his SRG designation would remain in place for at least another six months.  *Id.* at ¶ 183; Pl.'s Ex. P-2 (Dkt. No. 9-4 at 50).  The conclusion was based in part on

the fact that Plaintiff had received four DRs in the past six months.  Pl.'s
Ex. P-3 (Dkt. No. 9-4 at 51).  Plaintiff filed a grievance in response to this
conclusion, but his grievance was rejected.  Am. Compl. ¶ 185; Pl.'s Ex. P-5
(Dkt. No. 9-4 at 53).

On May 26, 2019, requested that a separation profile be created
between Flex and him.  Am. Compl. ¶ 187.  As of June 15, 2019, Plaintiff is
being treated for general anxiety and post-traumatic stress, which he
attributes to his history with the Bloods gang and the assaults.  *Id.* at ¶ 188.

III.    Analysis

Plaintiff claims that the defendants' failure to protect him from the
assaults in the SRG Unit and refusal to reinstate him in protective custody,
despite their knowledge of his predicament with the Bloods gang,
constituted deliberate indifference to his safety under the Eighth and
Fourteenth Amendments and violated his right to equal protection of the
laws under the Fourteenth Amendment.  *See* Am. Compl. ¶¶ 223-25.  He
seeks monetary, injunctive, and declaratory relief.

A.  Failure to Protect from Harm

Plaintiff first claims that the defendants acted with deliberate
indifference to his safety by refusing to reinstate him in protective custody
or move him out of the SRG unit despite informing them that members of
the Bloods gang were threatening and extorting him.  He brings this claim
under both the Eighth and Fourteenth Amendments.  The appropriate
standard for analyzing his claim depends on whether he was a prisoner or

11

pretrial detainee at the time of the deprivation.  *See Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) ("pretrial detainees have not been convicted of a crime and thus may not be punished in any manner – neither cruelly and unusually nor otherwise").  Thus, any violation occurring before his conviction would be analyzed under the Fourteenth Amendment's Due Process Clause whereas claims arising after conviction and sentencing are analyzed under the Eighth Amendment's Cruel and Unusual Punishment Clause.  *See id.*

State judicial records show that Plaintiff was convicted on November 5, 2018 of attempt to commit robbery in the first degree[1] and was sentenced to six and one-half years in prison.  *State v. Pennyman*, No. NNH-CR17-0294365-T (Conn. Super. Ct. Nov. 5, 2018).  Although both assaults occurred after he was convicted and sentenced, Plaintiff alleges that he had notified the defendants about being labeled as a snitch and about threats made against him for more than a year prior to his conviction. Thus, the unconstitutional conduct occurred while Plaintiff was both a pretrial detainee and a convicted prisoner.  Because, however, the Court concludes that Plaintiff's allegations state a plausible claim under both standards, it will permit the claim to proceed under both constitutional provisions at this time.

The Eighth Amendment requires prison officials to "take reasonable measures to guarantee the safety of . . . inmates."  *Hudson v. Palmer*, 468

---

[1] Conn. Gen. Stat. § 53a-134(a)(3).

12

U.S. 517, 526-27 (1984).  A prison official violates the prisoner's Eighth Amendment protection against cruel and unusual punishment only when the following two requirements are satisfied.  First, the prisoner must prove that the deprivation was "objectively, sufficiently serious . . . ."  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)).  He must prove that he is "incarcerated under conditions posing a substantial risk of serious harm."  *Id.*  Secondly, he must prove that the defendants acted with a "sufficiently culpable state of mind."  *Id.* (quoting *Wilson*, 501 U.S. at 302-03).  This requirement is based on the principle that "only the unnecessary and wanton infliction of pain implicates the Eighth Amendment."  *Id.* (quoting *Wilson*, 501 U.S. at 297).  The official must have disregarded an excessive risk to the prisoner's safety.  *See id.* at 837.

To prevail on a Fourteenth Amendment due process claim that officials failed to protect him from harm or acted with deliberate indifference to his safety, a pretrial detainee

> must prove that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the . . . detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety.

*Taylor v. City of New York*, No. 3:16-CV-7857 (NRB), 2018 WL 1737626, at *12 (S.D.N.Y. Mar. 27, 2018) (quoting *Darnell*, 849 F.3d at 35); *see also Karlo Conquistador v. Adamaitis*, No. 3:19-CV-430 (KAD), 2019 WL 1573710, at *2 (D. Conn. Apr. 11, 2019).

13

Construed liberally, Plaintiff's allegations state a plausible Eighth or Fourteenth Amendment claim against Aldi, Ferreira, Papoosha, Buttricks, Semple, Crandall, Vasquez, Lizon, Rodriguez, Murphy, Santiago, Feoirre, Mulligan, Rivera, Duran, Kelly, Faucher, Martinez, Hein, and Quiros.  He alleges that he informed these defendants about his history with the Bloods gang, including that he had been labeled as a snitch and that other Bloods members were threatening and extorting him.  Thus, the allegations show that these defendants either disregarded a substantial risk to Plaintiff's safety, or recklessly failed to act with reasonable care to mitigate such a risk, by keeping him confined in the SRG unit.

The allegations do not, however, state a plausible claim against Stompa or Maiga.  "It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'"  *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)).  The Court cannot identify any specific allegations made against these two defendants.  Although Plaintiff alleges that he sent letters to the population management unit regarding his situation on more than one occasion, there are no facts showing whether Stompa or Maiga personally received those letters and, thus, were aware that Plaintiff faced a substantial risk of harm in the SRG unit.  Therefore, the claims against Stompa and Maiga are dismissed.

14

B. <u>Equal Protection</u>

"The Equal Protection Clause . . . commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe,* 457 U.S. 202, 216 (1982)).  "To state an equal protection claim, a plaintiff must allege facts showing that: (1) he was treated differently from similarly situated individuals and (2) that the difference in or discriminatory treatment was based on 'impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'" *Trowell v. Theodarakis*, No. 3:18-CV-446 (MPS), 2018 WL 3233140, at *3 (D. Conn. July 2, 2018) (*quoting Diesel v. Town of Lewisboro,* 232 F.3d 92, 103 (2d Cir. 2000)).  A plaintiff may also state a Fourteenth Amendment equal protection claim under the "class of one" theory by showing that he was "intentionally treated differently from others similarly situated and that there [was] no rational basis for the difference in treatment."  *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

In this case, Plaintiff has not alleged sufficient facts showing that the defendants discriminated against him or treated him differently from other similarly situated inmates.  While the Court agrees that the allegations sufficiently show that the defendants failed to protect him from harm, they

15

do not show that the defendants deprived him of equal protection of the laws.  Therefore, the equal protection claim is dismissed.

  C. <u>Declaratory Relief</u>

  In addition to damages and injunctive relief, Plaintiff seeks declaratory judgments that the defendants violated his constitutional rights.  Am. Compl. at 53-54.  Declaratory relief operates prospectively to enable parties to adjudicate claims before either side suffers great damages.  *See In re Combustion Equip. Assoc., Inc.*, 838 F.3d 35, 37 (2d Cir. 1998).  Plaintiff has not identified any legal relationships or issues that require resolution by declaratory relief.  *See Ward v. Thomas*, 207 F.3d 114, 119-20 (2d Cir. 2000) (Eleventh Amendment bars declaration that state violated federal law in the past).  Therefore, the request for declaratory relief is dismissed.

## ORDERS

  (1) The motion to amend the complaint (Dkt. No. 9) is GRANTED.  The clerk is directed to docket the amended complaint (Dkt. No. 9-1) as a separate entry.

  (2) The claims against Stompa and Maiga are dismissed.  The clerk is directed to terminate those officials as defendants to this action.

  (3) The case may proceed on the Eighth and Fourteenth Amendment claims for deliberate indifference to safety against the remaining defendants in their individual capacities for damages and in their official

capacities for injunctive relief.  The equal protection claim and the request for declaratory relief are dismissed.

(4) The clerk shall prepare a summons form and send an official capacity service packet, including the amended complaint, to the United States Marshal Service.  The U.S. Marshal is directed to effect service of the amended complaint on the defendants in their official capacities at the Office of the Attorney General, 55 Elm Street, Hartford, CT 06141, within twenty-one (21) days from the date of this Order and file a return of service within thirty (30) days from the date of this Order.

(5) The clerk shall verify the current work addresses for the defendants with the DOC Office of Legal Affairs, mail a waiver of service of process request packet containing the amended complaint to them at the confirmed addresses within twenty-one (21) days of this Order, and report on the status of the waiver requests on the thirty-fifth (35th) day after mailing.  If any defendant fails to return the waiver request, the clerk shall make arrangements for in-person service by the U.S. Marshals Service on him/her, and he/she shall be required to pay the costs of such service in accordance with Federal Rule of Civil Procedure 4(d).

(6) The clerk shall mail a courtesy copy of the amended complaint and this Order to the DOC Office of Legal Affairs.

(7) The defendants shall file their response to the amended complaint, either an answer or motion to dismiss, within sixty (60) days from the date the notice of lawsuit and waiver of service of summons forms

17

are mailed to them.  If they choose to file an answer, they shall admit or deny the allegations and respond to the cognizable claims recited above. They may also include any and all additional defenses permitted by the Federal Rules.

(8) Discovery, pursuant to Fed. R. Civ. P. 26-37, shall be completed within six months (180 days) from the date of this Order.  Discovery requests need not be filed with the Court.

(9) The parties must comply with the District of Connecticut "Standing Order Re: Initial Discovery Disclosures," which will be sent to the parties by the Court.  The Order can also be found at http://ctd.uscourts.gov/administrative-standing-orders.  If any party objects to production ordered, such party must file an objection within ninety (90) days of the date of service stating with particularity the basis of the objection.  Vague or talismanic objections such as "safety and security" without  explanation will not suffice and will be summarily denied. Disclosure shall be produced to the requesting party within fourteen (14) days of the date of the denial of the objection.

(10)    All motions for summary judgment shall be filed within seven months (210 days) from the date of this Order.

(11)    Pursuant to Local Civil Rule 7(a), a nonmoving party must respond to a dispositive motion within twenty-one (21) days of the date the motion was filed.  If no response is filed, or the response is not timely, the dispositive motion can be granted absent objection.

(12)     If Plaintiff changes his address at any time during the litigation of this case, Local Court Rule 83.1(c)2 provides that he MUST notify the court.  Failure to do so can result in the dismissal of the case.  Plaintiff must give notice of a new address even if he is incarcerated.  He should write "PLEASE NOTE MY NEW ADDRESS" on the notice.  It is not enough to just put the new address on a letter without indicating that it is a new address.

SO ORDERED at Hartford, Connecticut.

*Vanessa Lynne Bryant*     Vanessa Bryant
                          2019.09.24 12:21:38 -04'00'

**VANESSA L. BRYANT**
**UNITED STATES DISTRICT JUDGE**